## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

INTERNATIONAL ALLIANCE OF FIRST NIGHT CELEBRATIONS, INC.,

§
§
§

Plaintiff,

§
§
§

v.

§
§

FIRST NIGHT, INC.,

§
§
§

Defendant.

§

**09 CA 11178· RBC**

**COMPLAINT**

Civil Action No.:

### COMPLAINT AND JURY DEMAND

COMES NOW, the Plaintiff, International Alliance of First Night Celebrations, Inc., as and for its Complaint against Defendant, alleges as follows:

### NATURE OF THE ACTION

1.      This is a civil action for injunctive relief, damages and other relief based on Defendant's infringement of the service mark "First Night", unfair competition, breach of contract, tortious interference with contractual relations, and tortious interference with prospective business relations in connection with the sublicensing, policing, education and promoting of annual New Year's Eve celebrations, in violation of federal and Massachusetts law.

### PARTIES, JURISDICTION AND VENUE

2.      Plaintiff, International Alliance of First Night Celebrations, Inc., ("FNI") was and is a non-profit corporation organized and existing under the laws of The Commonwealth of Massachusetts with its principal place of business at 67 Broad Street, Johnson City, New York 13790.

3.      Defendant, First Night, Inc., ("FNB") was and is a non-profit corporation, organized and existing under the laws of The Commonwealth of Massachusetts with its principal place of business at 36 Bromfield Street Suite 204 Boston, MA 02108.

4.      This Court has jurisdiction pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 and 1338.  This Court has jurisdiction over FNI's state law and common law claims pursuant to 28 U.S.C. §§ 1332 and 1367.

5.      Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims at issue occurred in this District.  Defendant is subject to the personal jurisdiction of this Court because it resides, or has committed the acts complained of, in this District.

## FACTS COMMON TO ALL COUNTS

## FIRST NIGHT AND THE FORMATION OF FNI

6.      On April 25, 1985, FNB filed a trademark application for "First Night" to identify "posters and commemorative programs dealing with art festivals" in International Class 16 and "entertainment services, namely, presenting an annual arts festival" in International Class 41.

7.      On November 12, 1985, United States Trademark Registration No. 1,370,110 issued for "First Night" (the "Mark").

8.      Duly licensed First Night celebrations and festivals ("First Night") are held in cities and towns around the world.  First Night seeks to foster the public's appreciation of visual and performing arts through an innovative, diverse and high quality New Year's Eve program which provides a shared cultural experience that is accessible and affordable to all.

9.     First Night is a community celebration of the New Year through, *inter alia*, the arts. A key concept of First Night is that it is an alcohol-free, public festival that marks the passage from the old year to the new with art, ritual and festivity.

10.     FNB is a non-profit corporation that produces, among other events and programs, First Night Boston.

11.     FNI is a non-profit corporation that was organized by FNB on September 30, 1991 to promote and foster the concept of First Night, to exclusively license the Mark, to authorize cities to hold First Night events, to assure compliance with prescribed licensing standards and to provide a forum for ideas, information, education, and services for participating communities.

12.     FNB organized FNI because FNB was unable to adequately manage the Mark and product a quality First Night event.

13.     FNI promotes, licenses and supports the development of First Night in communities around the world.

14.     FNI was organized under the direction of the Board of Directors of FNB.  FNB intended for FNI to be responsible for sublicensing and protecting the Mark, distributing information about First Night to communities that wished to hold their own celebrations, responding to inquiries from interested cities, monitoring  and protecting the use of the Mark by other cities, both licensed and unlicensed, and coordinating synergistic activities.

15.     During the early stages of organization, FNB shared staff, office space and board members with FNI.

3

## THE LICENSE AGREEMENT

16.     On August 16, 1993, FNB licensed FNI to assist other communities in developing and creating First Night celebrations, to promote the concept of First Night and to exclusively sub-license the Mark.  A true and correct copy of the license agreement (the "License Agreement") is attached hereto as Exhibit A and by this reference incorporated herein.

17.     FNI and FNB have been operating under the terms of the License Agreement continually since the License Agreement was executed and were continuing to operate under the terms of the License Agreement until July 2008.

18.     Pursuant to the terms of the License Agreement FNB granted a nontransferable and exclusive license to FNI to use the Mark "under the common law and under the auspices and privileges provided by any Registration covering the same for an initial five-year term." Exhibit A ¶ 1A.  The License Agreement was substantially exclusive, subject only to FNB's right to continue to use the Mark in connection with its own annual First Night celebration in Boston.

19.     FNI was exclusively authorized under the License Agreement to sub-license the Mark to communities that wished to hold celebrations in accordance with the concept of First Night.

20.     FNI was authorized to sub-license the Mark pursuant to certain standards (the "Standards").  The Standards were made a part of the License Agreement and incorporated therein.

21.     Among the terms and conditions set forth in the Standards were the requirements that FNI ensure that the Mark was used properly and appropriately by individual communities for a specified period of time, that the sub-licensee was a member in good standing of FNI (the

4

"Member Communities"), and that all First Night celebrations were conducted in accordance with the Standards set forth in the License Agreement.

22.     FNI also adopted licensing protocols (the "Protocols") in conjunction with the License Agreement, to promote FNI's mission and develop the Mark. As required by the License Agreement, the Protocols ensured compliance with FNI's mission, as well as the terms of the License Agreement. A true and correct copy of the Protocols is attached hereto as Exhibit B and by this reference incorporated herein.

23.     The License Agreement had an initial five-year term.

24.     Pursuant to the terms of the License Agreement, upon the expiration of the initial five-year term, FNB agreed to transfer "all right, title and interest in and to the Mark" to FNI. Exhibit A, ¶ 1B. The assignment was conditioned upon FNI complying with the terms of the License Agreement and achieving financial stability. "Financial stability" was defined as FNI being able to operate for at least two of the last three years of the initial five-year term at break-even or a profit.

25.     If FNI did not achieve financial stability in the initial five-year term, the License Agreement automatically renewed for an additional five-year term. At the end of any such renewal term, if FNI did not achieve financial stability, the License Agreement would automatically terminate.

26.     In 1998, at the end of the initial five-year term, FNI had complied with the terms of the License Agreement and had achieved financial stability as defined in the License Agreement.

5

27.     Despite FNI's full and complete compliance with the terms of the License Agreement, FNB failed to assign the rights to the Mark to FNI pursuant to the terms of the License Agreement.

28.     FNI continued to operate under the terms of the License Agreement, and in 1999, FNB agreed to allow FNI to continue to operate pursuant to the terms of the License Agreement, including granting sub-licenses to communities and non-profit organizations to hold New Year's Eve celebrations in accordance with the concept of First Night, policing the Mark and ensuring compliance with the Standards and Protocols.

29.     FNI's authorization to continue operating under the License Agreement was granted by the Board of Directors of FNB and memorialized in a letter to FNI.  A true and correct copy of the letter from FNB to FNI is attached as Exhibit C and by this reference incorporated herein.

30.     FNB also expressly recognized that FNI was at that time "properly continuing to grant sub-licenses."  Exhibit C ¶ 3.

31.     Today, there are more than 75 Member Communities in the United States, Canada and New Zealand who are part of FNI, including FNB.

32.     Due to FNB's actions, there are fewer Member Communities today than there were one year ago.

33.     To date, only 12 Member Communities have paid their license fees to FNI.  Two Member Communities have notified FNI that they do not wish to renew their sub-license.

34.     FNB has been listed as a Member Community in the annual directory published by FNI.

6

35.     FNB is currently listed as a Member Community on FNI's website at

http://www.firstnight.com. Exhibit D, which is a true and correct copy from FNI's web site

listing all Member Communities, is attached hereto and by this reference incorporated herein.

36.     At no time has FNB asked to be removed from FNI's website.

37.     Since execution of the License Agreement, FNI has complied with all terms and

conditions of the License Agreement.

38.     Since execution of the License Agreement, all sub-license fees have been paid to

FNI, pursuant to the terms of the License Agreement.

39.     Since execution of the License Agreement, FNB has never received payment of

sub-license fees from any Member Communities.

40.     Since execution of the License Agreement, FNI has had exclusive

communications with Member Communities, including FNB.

41.     Since execution of the License Agreement, FNB has accepted sponsorship and

Foundation dollars negotiated by FNI for the benefit of Member Communities.

42.     Since execution of the License Agreement, FNB has participated as a Member

Community in accordance with the terms of the License Agreement.

43.     Although not expressly required to do so, FNB, as a Member Community,

although not required to doso, has paid sub-license fees and dues to FNI, recognizing FNI's

authority and existence pursuant to the terms of the License Agreement.

44.     FNB, as a Member Community of FNI, received and accepted awards from FNI.

45.     In 1999, FNB unlawfully licensed the Mark for use on champagne glasses.  This

was a direct violation of the terms of the License Agreement and in direct contravention to the

cornerstone non-alcoholic policy of First Night.

7

46.     When FNI became aware of FNB's inappropriate use of the Mark, pursuant to the terms of the License Agreement, FNI notified FNB that its actions were improper and inappropriate.

47.     After communication with FNI, FNB revoked the license for use of the Mark on the champagne glasses.

48.     Since execution of the License Agreement, FNI has monitored use of the Mark by Member Communities and has policed the Mark when it was used without permission, sending cease and desist letters to infringing users.

49.     With FNB's knowledge and permission, FNI registered the Mark in the European Union and Canada.

## TERMINATION OF THE LICENSE AGREEMENT

50.     On July 1, 2008, Virginia Mampre ("Mampre"), who was then Chairperson of the Board of Directors of FNI, received a telephone call from Geri Guardino ("Guardino") who is the Executive Director for FNB, notifying FNI that the Board of Directors of FNB authorized FNB to "take back" the Mark from FNI.

51.     Mampre asked Guardino for written confirmation of FNB's intent with regard to the Mark, and on July 2, 2008, Guardino sent an email to Mampre outlining FNB's intentions.

52.     Mampre responded to Guardino asking that FNB not act until FNI's Board of Directors could meet and discuss FNB's intentions.

53.     In her email, Guardino asserted that FNB "owns and maintains" the Mark and believed it was in the best interest of all Member Communities for FNB to "begin managing the [Mark] as soon as possible."

54.    In addition, FNB notified FNI that it intended to inform all Member Communities on or before August 1, 2008 of FNB's intention to "begin managing the Mark". A true and correct copy of the email correspondence between Mampre and Guardino is attached hereto as Exhibit E and by this reference incorporated herein.

55.    In its response, FNI asked FNB to refrain from communicating with Member Communities until the Board of Directors of FNI had had a chance to discuss FNB's actions and to formally respond to FNB.

56.    On July 24, 2008, FNI sent FNB a Letter of Intent (the "Letter of Intent") outlining FNI's response to FNB's pronouncement that it was going to "take back" the Mark. FNI also set out the terms and conditions under which it would assign rights to the Mark to FNB. A true and correct copy of the Letter of Intent is attached hereto as Exhibit F and by this reference incorporated herein.

57.    On July 31, 2008, FNI sent a cease and desist letter to FNB. A true and correct copy of the cease and desist letter is attached hereto as Exhibit G and by this reference incorporated herein.

58.    On August 7, 2008, FNI received a cease and desist letter from FNB. A true and correct copy of the letter is attached hereto as Exhibit H and by this reference incorporated herein. FNB alleged that it "has been and continues to be the owner of the [Mark]".

59.    FNB also demanded that FNI refrain from interfering in any way with FNB's management of the Mark and communication with Member Communities.

60.    FNB also threatened legal action if FNI continued to operate pursuant to the terms of the License Agreement. See Exhibit H ¶ 4.

9

61.     FNB's demands and threats were a direct violation of the terms of the License Agreement.

62.     Despite FNB's threats, communications between FNI and FNB ensued, as it was FNI's desire to effectuate a smooth transition, provided FNB would provide assurance to FNI that any costs associated with the assignment of the Mark would be paid by FNB.  FNB rejected any proposals from FNI regarding transition of the Mark.

63.     On August 26, 2008, FNI sent FNB a letter regarding issues that FNI felt needed to be addressed.  A true and correct copy of the letter is attached hereto as Exhibit I and by this reference incorporated herein.

64.     Despite FNI's request that FNB not communicate with Member Communities, on September 5, 2008, FNB notified FNI that on August 11, 2008, it had mailed a letter to approximately 100 Member Communities notifying them that FNB was taking back the management of the Mark and would be providing related technical assistance services.  A copy of the email notification and the letter sent by FNB to Member Communities is attached hereto as Exhibit J and by this reference incorporated herein.

65.     As part of the September 5, 2008 communication, FNB demanded that FNI discontinue invoicing any fees from new or existing Member Communities.  See Exhibit J.

66.     On January 26, 2009, FNB sent a letter to Member Communities discussing the lawsuit that FNI filed in the United States District Court for the Northern District of New York, the reasons FNB was "taking back" the Mark, and expressly advising the Member Communities not to send their license fees to FNI.  A copy of the letter is attached hereto as Exhibit K and by this reference incorporated herein.

67.     On May 29, 2009, FNB sent another letter to Member Communities advising them that FNI's lawsuit had been dismissed.  FNB informed Member Communities that it was time to "move forward".

68.     Despite having no legal agreement with the Member Communities, FNB informed Member Communities that it would be sending invoices for the year 2010 and no license fees should be sent to FNI.  A copy of the letter is attached hereto as Exhibit L and by this reference incorporated herein.

69.     FNB's improper and unlawful conduct has caused confusion for Member Communities who are unsure of where to turn for assistance in planning their First Night celebrations.

70.     FNB's interference has caused a loss of membership and forced Member Communities not to renew their sub-licenses with FNI.

71.     FNB's interference has prevented FNI from enforcing and protecting the Mark.

72.     FNB's interference has prevented FNI from securing new licenses, maintaining revenues and collecting license fees that are owed to FNI.

73.     FNB's interference has prevented FNI from providing assistance to Member Communities so that they can continue to produce quality celebrations in a difficult and tumultuous economy.

74.     FNB does not have authority to terminate the License Agreement or "take back" the Mark.

75.     Pursuant to the terms of the License Agreement, FNB can terminate the License Agreement in only two instances:

> A. "[FNB] may terminate the License Agreement at any time upon written notice to [FNI] in the event that (i) [FNI] ceases for any reason to be a non-profit entity; (ii)

[FNI] fails to comply, or require compliance of its sub-licensees, with the terms, conditions and standards set forth in [the License Agreement]; or (iii) [FNI] breaches any other term of [the License Agreement] and such breach is not cured within thirty (30) days of written notice to [FNI] of such breach; or

B. If [FNI] makes any assignments of assets or business for the benefit of creditors, or a trustee or receiver is appointed to conduct its business or affairs, or it is adjudged in any legal proceeding to be either a voluntary or involuntary bankrupt, then the rights granted herein shall forthwith cease and terminate without prior notice or legal action by [FNB]."

Exhibit A ¶¶ 9A and 9B.

76.     None of the conditions for termination has been met.

77.     FNI remains a non-profit entity.

78.     FNI continues to ensure that sub-licensees meet the terms and conditions of the sub-licenses.

79.     FNI is not in breach of the License Agreement in any other manner, nor has FNB notified FNI of any such breach.

80.     FNI has not assigned its assets or its business, nor has FNI been adjudged to be either a voluntary or involuntary bankrupt.

## OWNERSHIP OF THE "FIRST NIGHT" MARK

81.     Despite FNB's failure to assign the Mark to FNI pursuant to the terms of the License Agreement, FNI is the proper owner of the Mark.

82.     Ownership of a federally registered trademark is evidenced by use in interstate commerce and enforcement of the exclusive rights to the Mark.

83.     FNI has continually used the Mark in interstate commerce since the License Agreement was executed in 1993.

84.     FNB has not used the Mark in interstate commerce since the License Agreement was executed in 1993.

12

85.     FNI has exclusively licensed and continues to license the Mark since the License Agreement was executed in 1993.

86.     FNB has not licensed the Mark to any entity apart from FNI since the License Agreement was executed in 1993.

87.     FNI has policed the Mark and ensured compliance with the Standards and Protocols in accordance with the terms of the License Agreement.

88.     FNI ensured FNB's compliance with the Standards and Protocols in 1999 when FNB attempted to license the mark for use on champagne glasses.

89.     FNI communicated with FNB, advising it to cease and desist use of the Mark in connection with champagne glasses.  FNB complied with FNI's demands.

90.     FNB has not policed the Mark since the License Agreement was executed in 1993.

91.     FNI has complied with all terms of the License Agreement.

92.     Pursuant to the terms of the License Agreement, ownership of the Mark should have been transferred to FNI.

93.     Since execution of the License Agreement in 1993, FNI has acted as the owner of the Mark.

### COUNT I

### FEDERAL TRADEMARK INFRINGEMENT, 15 U.S.C. § 1114

94.     FNI incorporates the allegations set forth in paragraphs 1 through 93 as if fully rewritten herein.

95.     Defendants' unlawful and improper use of the Mark has deceived and caused, and is likely to continue to deceive and cause, confusion and mistake among Member Communities and consumers.

96.     FNI did not authorize, license or otherwise condone or consent to Defendants' unlawful and improper use of the Mark in connection with First Night celebrations.

97.     Defendants have misappropriated FNI's intellectual property rights as well as the goodwill associated therewith. Unless restrained and enjoined by this Court, such conduct will continue to harm FNI.

98.     As a result of FNB's unlawful activities, FNI has suffered and continues to suffer irreparable harm.

99.     As a direct and proximate result of FNB's unlawful activities, FNI has suffered and continues to suffer damages in an amount that will be established at trial.

## COUNT II

## FEDERAL UNFAIR COMPETITION, 15 U.S.C. § 1125(a)

100.    FNI incorporates the allegations set forth in paragraphs 1 through 99 as if fully rewritten herein.

101.    FNB's use of the Mark has deceived and caused, and is likely to continue to deceive and cause, confusion and mistake among Member Communities as to the authority and the source or origin of the services offered by FNI.

102.    FNB has acted willfully, with full knowledge of FNI's rights and with the intention of deceiving and misleading the public.

103.    FNB has acted willfully, with full knowledge of FNI's rights and with the intention of causing harm to FNI.

14

104.     FNB has acted willfully, with full knowledge of FNI's rights and the intention of misappropriating and wrongfully trading upon the valuable goodwill and reputation of FNI and the Mark.

105.     FNB will continue its acts of unfair competition, and FNI will be irreparably injured thereby, unless such activities are enjoined by this Court.

106.     FNB has benefited by reason of, and as a direct result of, the acts of unfair competition. As a direct result of this unfair competition, FNB has seriously damaged and continues to damage FNI in an amount that is not now presently ascertainable, but will be established at trial.

## COUNT III

## BREACH OF CONTRACT

107.     FNI incorporates the allegations set forth in paragraphs 1 through 106 as if fully rewritten herein.

108.     Defendant FNB entered into a License Agreement with FNI.

109.     FNI and FNB have been operating under the terms of the License Agreement since it was executed on August 16, 1993.

110.     FNI fully performed, and did not breach, the License Agreement with FNB.

111.     Through its actions, including unilaterally terminating the License Agreement, FNB breached the License Agreement.

112.     FNB's breach of the License Agreement was a material breach.

113.     FNB's breach of the License Agreement has been willful, deliberate and malicious.

114.    The wrongful conduct of FNB has seriously damaged and continues to damage
FNI in an amount that is not presently ascertainable, but will be established at trial. FNB will
continue these acts in breach of the License Agreement and FNI will be irreparably harmed
thereby unless such activities are enjoined by this Court.

## COUNT IV

## TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS

115.    FNI incorporates the allegations set forth in paragraphs 1 through 114 as if fully
rewritten herein.

116.    FNB entered into a License Agreement with FNI granting FNI the right to assist
other communities in developing and creating First Night celebrations, to promote the concept of
First Night and to sub-license the Mark.

117.    FNB granted FNI an exclusive license to use the Mark, subject only to FNB's
right to use the Mark in connection with its own First Night celebration in Boston.

118.    FNI was exclusively authorized to sub-license the Mark to communities
throughout the world that wished to hold celebrations in accordance with the Standards and
concept of First Night.

119.    FNB did not retain any right to sub-license the Mark, to police the Mark or to
ensure compliance with the Standards or the sub-license agreements.

120.    Despite the existence of a valid License Agreement, the Board of Directors for
FNB permitted, caused, encouraged, and/or induced FNB to breach the License Agreement and
unilaterally terminate the License Agreement. The Board of Directors for FNB permitted,
caused, encouraged and/or induced FNB to interfere with FNI's communications and sub-license

16

Case 1:09-cv-11178-JLT   Document 1   Filed 07/10/09   Page 17 of 21

agreements with the Member Communities, by, *inter alia*, transmitting an email message in 2009 to Member Communities expressly directing them not to send license fees to FNI.

121.   There was no privilege or justification for the conduct of FNB and the Board of Directors for FNB.

122.   By engaging in the conduct and permitting, causing, encouraging and/or inducing FNB to breach the License Agreement with FNI, FNB, with the knowledge and consent of the Board of Directors for FNB have tortiously interfered with FNI's rights under the License Agreement.

123.   FNB, with the knowledge and consent of the Board of Directors for FNB engaged in the aforesaid conduct in a willful and malicious manner and with an improper motive and through improper means, in that FNB and the Board of Directors for FNB sought to injure FNI, damage FNI's goodwill, and unfairly reap the benefits of FNI's goodwill.

124.   As a direct result of the wrongful conduct of FNB and the Board of Directors for FNB, FNI's reputation, business and goodwill has been damaged, and such damage includes the loss of FNI's goodwill as well as the loss or potential loss of sub-license revenues, the loss of sponsorship and Foundation dollars and the loss of donor revenue.  FNB and the Board of Directors for FNB have seriously damaged and continue to damage FNI in an amount that is not now presently ascertainable, but will be established at trial.

### COUNT V

### TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS

125.   FNI incorporates the allegations set forth in paragraphs 1 through 124 as if fully rewritten herein.

17

126.    FNI has developed and maintains advantageous business relations with Member Communities.

127.    FNB knew or should have known about the advantageous business relations of FNI with Member Communities

128.    FNB intentionally, maliciously and improperly interfered with FNI's relationships with Member Communities by, among other things, its efforts to induce Member Communities to sever their relationship with FNI and induce Member Communities to send licensing fees and dues to FNB for FNB's benefit.

129.    FNB has otherwise intentionally, maliciously and improperly acted to destroy FNI and its ability to transact business relating to its management and policing of the Mark, thereby directly damaging FNI's relationships with Member Communities.

130.    There was no privilege or justification for the conduct of FNB.

131.    As a direct result of its acts of tortious interference with FNI's business relations and prospective business relations, FNB has seriously damaged and continues to damage FNI in an amount that is not now presently ascertainable, but will be established at trial.

132.    FNB will continue its acts of tortious interference with FNI's business relations and FNI will be irreparably injured thereby, unless such activities are enjoined by this Court.

## COUNT VI

## COMMON LAW UNFAIR COMPETITION

133.    FNI incorporates the allegations set forth in paragraphs 1 through 132 as if fully rewritten herein.

134.    The foregoing acts of FNB constitute unfair competition under the laws of the State of Massachusetts.

18

135.    FNB's use of the Mark has deceived and caused, and is likely to continue to deceive and cause, confusion and mistake among Member Communities as to the authority and the source or origin of the services offered by FNI.

136.    FNB has acted willfully, with full knowledge of FNI's rights and with the intention of deceiving and misleading the public.

137.    FNB has acted willfully, with full knowledge of FNI's rights and with the intention of causing harm to FNI.

138.    FNB has acted willfully, with full knowledge of FNI's rights and the intention of misappropriating and wrongfully trading upon the valuable goodwill and reputation of FNI and the Mark.

139.    FNB will continue its acts of unfair competition, and FNI will be irreparably injured thereby, unless such activities are enjoined by this Court.

140.    FNB has benefited by reason of, and as a direct result of, the acts of unfair competition.  As a direct result of this unfair competition, FNB has seriously damaged and continues to damage FNI in an amount that is not now presently ascertainable, but will be established at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, FNI hereby requests that this Court enter judgment in its favor and order:

A.      That a preliminary and permanent injunction be entered enjoining any further acts of unfair competition by FNB;

B.      That a preliminary and permanent injunction be entered enjoining any further tortious interference with FNI's contractual relations with Member Communities;

C.     That a preliminary and permanent injunction be entered enjoining any further tortious interference with FNI's prospective business relations;

D.     That a preliminary and permanent injunction be entered enjoining any further infringement of the Mark;

E.     That FNI be awarded the damages it has sustained as a result of FNB's unlawful acts, including actual and consequential damages;

F.     That FNI be declared the owner of the Mark;

G.     That FNI be awarded FNB's profits pursuant to 15 U.S.C. § 1117;

H.     That FNI be awarded treble damages pursuant to 15 U.S.C. § 1117;

I.     That FNI be awarded its costs and disbursements for this action and its reasonable attorneys' fees, pursuant to 15 U.S.C. § 1117; and

J.     That FNI be granted such other and further relief that this Court deems just and proper.

## JURY DEMAND

FNI respectfully requests a trial by jury on all issues triable thereby.

Respectfully submitted,

INTERNATIONAL ALLIANCE OF FIRST
NIGHT CELEBRATIONS, INC.

By Its Attorneys,

Dated: July 10, 2009

Michael J. Lambert, BBO#632053
Sheehan Phinney Bass + Green, PA
255 State Street
Boston, MA 02109
(617) 897-5637
mlambert@sheehan.com

*Of Counsel*

Mark Levy
Heather V. Miller
Hinman, Howard & Kattell, LLP
700 Security Mutual Building
80 Exchange Street
P.O. Box 5250
Binghamton, NY 13902-5250
(607-723-5341)
hmiller@hhk.com