# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

**INTERNATIONAL ALLIANCE OF
FIRST NIGHT CELEBRATIONS, INC.**

        Plaintiff,                 **CASE NO.:**
                                        **09-CV-011178-JLT**

        vs.

                                   **DATE:**
                                      **SEPTEMBER 16, 2009**

**FIRST NIGHT, INC.**

        Defendant

_____/

## ANSWER TO COMPLAINT, AFFIRMATIVE DEFENSES & COUNTERCLAIMS

The defendant, First Night Inc. ("FNB") by and through their attorneys, David Russman of the Russman Law Firm P.C and Mario G. Ceste of the Law Offices of Mario G. Ceste LLC, hereby submits their answer to the complaint, their affirmative defenses and their counterclaims as follows:

## NATURE OF ACTION

1.      Defendant owns all rights, title and interest to the mark "FIRST NIGHT" and cannot infringe its own mark. Defendant had terminated its prior contract[1] with plaintiff for lapse

---

[1] In 1993, Defendant and Plaintiff entered into a license agreement . All or certain provisions of that 1993 license agreement are void as a matter of law because some FNB board members may have violated their fiduciary responsibilities in negotiating and approving the agreement. Said  board members had relationships with FNI creating an inherent conflict of interest. Further, certain provisions of the license agreement contemplated the potential transfer of substantial FNB assets and did not follow statutory rules. Therefore Defendant, by any answer

of time and in accordance with the termination provisions of the contract. Once the contract was terminated, plaintiff no longer had any rights there under and defendant immediately became entitled to all rights under any sublicenses. Any and all remaining allegations not specifically admitted are denied.

## PARTIES, JURISDICTION AND VENUE

2.     Defendant believes plaintiff, International Alliance of First Night Celebrations, Inc. ("FNI") was organized as non-profit corporation, but is without specific knowledge if such non-profit status is presently valid. Defendant believes that the current business address of FNI is 67 Broad Street, Johnson City, New York 13790 but is without specific knowledge as whether FNI still conducts business from such address.

3.     Defendant is a non-profit corporation registered and existing under the law of the Commonwealth of Massachusetts. Defendant's office is located at 36 Bromfield Street, Suite 204, Boston, MA 02108.

4.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. 1338(a) (acts of Congress relating to copyrights and trademarks) namely, the Lanham Act, 15 U.S.C. §1051 et seq.,  28 U.S.C. 1338(b) (pendent unfair competition claims).

5.     Venue is proper in this district pursuant to 28 U.S.C. 1391, as the Defendant is a business which resides in this district.

## FACTS COMMON TO ALL COUNTS

## FIRST NIGHT AND THE FORMATION OF FNI

6.     On April 25, 1985, FNB filed a trademark application Serial No. 73534175 ("'175

---

provided hereunder, does not waive any right to challenge the validity of all or certain provisions of the license agreement.

Application") for "FIRST NIGHT" (the "MARK") in International Class 016, associated with its

use for posters and commemorative programs dealing with art festivals, and in International

Class 041, associated with its use for entertainment services namely presenting an annual arts

festival. Subsequently, on June 29, 1993, FNB filed a trademark application Serial No. 74407349

("'349 Application") for the MARK in International Class 021, associated with its use for mugs

sold connection with an annual arts festival or related activities throughout the year, and in

International Class 025, associated with its use for T-shirts, sweatshirts, jackets, headbands, hats,

sold in connection with an annual art festival and related activities conducted throughout the

year.

7.      On November 12, 1985, United States Trademark Registration No. 1,370,110

issued for the '175 Application. Subsequently on December 23, 1991 and March 28, 2005, FNB

filed the necessary renewals with the United States Patent and Trademark Office to maintain the

registration. The registration remains in force and in good standing today.

        On February 13, 1996, United States Trademark Registration No. 1,955,526

issued for the '349 Application. Subsequently on August 23, 2001 and January 30, 2006, FNB

filed the necessary renewals with the United States Patent and Trademark Office to maintain the

registration. The registration remains in force and in good standing today.

8.      Since 1976, celebrations and festivals have been held under the name "First

Night". Originating in Boston, by approximately 1980 the events had expanded to cities and

towns around the world. The events serve as a great community gathering for a diverse audience

forming a spectacular festival that inspires creativity in kicking off the new year. Licensees may

also organize and conduct cultural events in their individual communities not only on New

Year's Eve but throughout the year. Any and all remaining allegations or facts not specifically

3

admitted are denied.

9.      First Night was started by a group of artists and local residents in Boston who sought an alternative to traditional New Year's Eve revelry. They sought a family friendly alcohol-free celebration. Since then, the celebration has grown from a small arts event centered on the Boston Common to a major festival of the arts in as many as 200 communities in North America and abroad with related year-round community programming. Any and all remaining allegations or facts not specifically admitted are denied.

10.     FNB is a non-profit corporation that produces the First Night program in Boston and other events and programs throughout the year. FNB owns and controls the MARK and licenses its use in other communities.

11.     Upon information and belief, FNI was formed as a non-profit corporation. Whether FNI has maintained its non-profit status, the plaintiff is left to their proof. In 1993, FNB entered into a license agreement with FNI (the "1993 License Agreement"), which granted certain exclusive rights to the MARK subject to FNI's compliance with the terms of the agreement. FNI was authorized to sub-license the MARK under the agreement. Subsequently, at least as early as 2003, the 1993 License Agreement ended for lapse of time. FNB continued to grant FNI limited rights to the Mark until 2008 when it terminated all of FNI's licensed rights to the MARK. Any rights under the license agreement held by FNI were extinguished at the time the license was terminated in 2008. Any and all remaining allegations or facts not specifically admitted are denied.

12.     On or about 1993, when FNB entered into the 1993 License Agreement with FNI, it was FNB's intention to focus on the Boston activities and to delegate to FNI the responsibility for expansion of the MARK in other communities. At all times, FNB has maintained control

4

over the use of the MARK and any sub-licenses granted either directly itself or through its license agreement with FNI. Any and all remaining allegations or facts not specifically admitted are denied.

13.     FNI recruited and managed sub-licenses for the MARK pursuant to the 1993 License Agreement with FNB from 1993 until such time that the license terminated for lapse of time. Eventually in 2008, FNB rightfully terminated FNI's rights to the MARK. Any and all remaining allegations or facts not specifically admitted are denied.

14.     The 1993 License Agreement between FNB and FNI speaks for itself with regard to the purpose and intention of the relationship between FNB and FNI.  Any and all remaining allegations or facts not specifically admitted are denied.

15.     For some time period after the 1993 License Agreement was established, FNB allowed FNI to utilize facilities and services located at FNB's office location. Any and all remaining allegations or facts not specifically admitted are denied.

**THE LICENSE AGREEMENT**

16.     FNB admits that the license agreement attached to the Complaint as Exhibit A represents the 1993 License Agreement between FNB and FNI controlling the permitted use of the MARK until 2003 and all collateral terms and conditions surrounding the rights granted thereunder. (Nothwithstanding the rights reserved as stated in Footnote 1). As for other facts and circumstances, the 1993 License Agreement speaks for itself. Therefore any and all remaining allegations or facts not specifically admitted are denied.

17.     From the date of execution until 1998, the initial term of the 1993 License Agreement remained in effect. As of 2003, the tenth anniversary of the 1993 License Agreement, FNI had failed to meet the necessary criteria to avoid termination of its license from FNB.

However FNB, at its sole discretion, allowed FNI to maintain certain limited exclusive rights under the 1993 License Agreement on a month to month basis. On or about July 2008, FNB notified FNI it was terminating all rights to the MARK which it had granted to FNI.

18.     As for the terms and conditions of any license between FNB and FNI, the 1993 License Agreement speaks for itself. FNB admits that the 1993 License Agreement did have an initial five-year term. Therefore any and all remaining allegations or facts not specifically admitted are denied.

19.     FNB admits that the 1993 License Agreement did give FNI certain exclusive rights to sub-license the MARK to others, subject to specific terms and conditions as well as performance criteria required of FNI. As for the terms and conditions of the license between FNB and FNI, the 1993 License Agreement speaks for itself. Therefore any and all remaining allegations or facts not specifically admitted are denied.

20.     FNB admits that the 1993 License Agreement did give FNI certain rights to sub-license the MARK to others, subject to specific terms and conditions as well as performance criteria required of FNI. As for the terms and conditions of the license between FNB and FNI, the 1993 License Agreement speaks for itself. Therefore any and all remaining allegations or facts not specifically admitted are denied.

21.     FNB admits that the 1993 License Agreement did give FNI certain rights to sub-license the MARK to others, subject to Paragraph 2 of said agreement, along other terms and conditions.  The standards and terms for sub-licensees are substantially set forth in Schedule 1 and Schedule 2 attached to the 1993 License Agreement. Any and all remaining allegations or facts not specifically admitted are denied.

22.     FNI is left to its proof of the allegations stated in Paragraph 22 of the Complaint.

Therefore any and all remaining allegations or facts not specifically admitted are denied.

23.     FNB admits the 1993 License Agreement had an initial five year term.

24.     Pursuant to the 1993 License Agreement, FNI could potentially obtain assignment of the mark U.S. Trademark Reg. No. 1,435,685 if it complied, to FNB's satisfaction, with the terms of the 1993 License Agreement including but not limited to achieving "financial stability". Financial stability was defined under the 1993 License Agreement as FNI operating for two of the last three years during either the initial or renewal term of the 1993 License Agreement at break-even or a profit. Any and all remaining allegations or facts not specifically admitted are denied.

25.     Upon FNI's lack of financial stability at the conclusion of the initial term, the 1993 License Agreement renewed for an additional five year term. At the conclusion of the renewal term, FNI did not have financial stability, and the 1993 License Agreement automatically terminated. After the 1993 License Agreement terminated, FNB allowed FNI to continue to grant sub-licenses on temporary basis and for as long as FNB desired. Subsequently in 2008, FNB notified FNI it was terminating FNI's right to grant sub-licenses.

26.     FNI is left to its proof that it had achieved financial stability and that it had complied with all remaining terms of the 1993 License Agreement. Therefore any and all remaining allegations or facts not specifically admitted are denied.

27.     FNI did not and has not demonstrated that it was in full and complete compliance with the terms of the 1993 License Agreement. Therefore, in accordance with said agreement, the 1993 License Agreement automatically terminated. FNB had and has no further obligations to FNI except for the gratuitous continuing rights it may have granted to FNI. FNI is left to its proof of the allegations stated in paragraph 27 of the Complaint. Therefore any and all remaining

7

allegations or facts not specifically admitted are denied.

28.     After the 1993 License Agreement terminated for lapse of time when FNI failed to fully comply with its terms and conditions, FNI allowed FNB to continue to grant sub-licenses on temporary basis and for as long as FNB desired. Subsequently in 2008, FNB notified FNI it was terminating FNI's right to grant sub-licenses.

29.     FNB admits that its board of directors authorized FNI to continue granting sub-licenses on a temporary basis. FNB believes that Exhibit C to the Complaint, represents correspondence from FNB to FNI relating to its board's authorization. As for the specific details of such correspondence the document speaks for itself. Therefore any and all remaining allegations or facts not specifically admitted are denied.

30.     The document, Exhibit C to the Complaint, speaks for itself. Therefore any and all remaining allegations or facts not specifically admitted are denied.

31.     FNB is without specific knowledge of the complete list of communities operating under sub-licenses. FNB is left to its proof of the allegations of Paragraph 31 of the Complaint. Therefore any and all remaining allegations or facts not specifically admitted are denied.

32.     FNI's financial instability, its lack of staffing, and lack of prudent management is the sole cause of any decline in the number of sub-licensees over the past number of years. Therefore any and all remaining allegations or facts not specifically admitted are denied.

33.     FNB is without specific knowledge of whether or not FNI has collected license fees from the sub-licenses in 2008 or 2009 and years prior. FNI is left to its proof of the allegations of Paragraph 33 of the Complaint. Therefore any and all remaining allegations or facts not specifically admitted are denied.

34.     FNB is without specific knowledge of FNI's membership list. FNB believes that

FNI has listed it in the member directory. FNI is left to its proof of the allegations of Paragraph 34 of the Complaint. Therefore any and all remaining allegations or facts not specifically admitted are denied.

35.    FNB does not believe that the domain www.firstnight.com is an active website. FNI is left to its proof of the allegations of Paragraph 35 of the Complaint. Therefore any and all remaining allegations or facts not specifically admitted are denied.

36.    FNB admits it has not requested removal from any FNI member list including but not limited any FNI website.

37.    FNI has not compiled with the terms of the 1993 License Agreement. Certain terms of the 1993 License Agreement are void as matter of law, including but not limited the reason stated in Footnote 1. Any and all remaining allegations or facts not specifically admitted are denied.

38.    Pursuant to the 1993 License Agreement and only while said license agreement or ongoing rights granted by FNB were in effect, FNB allowed FNI to collect and retain all fees collected from its sub-licensees. Any and all remaining allegations or facts not specifically admitted are denied.

39.    Pursuant to the 1993 License Agreement and only while said license agreement was in effect, FNB allowed FNI to collect and retain all fees collected from its sub-licensees. Once all license rights to the MARK were rightfully terminated by FNB, FNB held all rights to collect the fees from any sub-licensees. Any and all remaining allegations or facts not specifically admitted are denied.

40.    Only while FNI's rights to the MARK were in effect, FNB allowed FNI to maintain communications with the sub-licensees. Once the license agreement was rightfully

terminated by FNB, FNB held all rights to communicate with any sub-licensees regarding the licensed use of the Mark. Any and all remaining allegations or facts not specifically admitted are denied.

41.    FNB may have accepted a small grant from FNI which was part of a larger "millennium" grant received by FNI. The grant may or may not have been related to any activities conducted by FNI. FNI is left to its proof of the allegations of Paragraph 41 of the Complaint. Therefore any and all remaining allegations or facts not specifically admitted are denied.

42.    FNB retained specific rights under the 1993 License Agreement. As for those rights, said license agreement speaks for itself. FNI is left to its proof of the allegations of Paragraph 42 of the Complaint. Therefore any and all remaining allegations or facts not specifically admitted are denied.

43.    FNB may have paid fees which assisted FNI financially. FNB at one point made its facilities and infrastructure available to FNI. FNI is left to its proof of the allegations of Paragraph 43 of the Complaint. Therefore any and all remaining allegations or facts not specifically admitted are denied.

44.    FNB has received numerous awards, some of which may have been issued by FNI. FNI is left to its proof of the allegations of Paragraph 44 of the Complaint. Therefore any and all remaining allegations or facts not specifically admitted are denied.

45.    To extent that the allegations of Paragraph 45 of the complaint are accurate, FNB has maintained the integrity of the Mark(s). FNI is left to its proof of the allegations of Paragraph 45 of the Complaint. Therefore any and all remaining allegations or facts not specifically admitted are denied.

46.     Whether FNI notified FNB or not, as FNI admits in paragraph 47, FNB maintained the integrity of the Mark(s). FNI is left to its proof of the allegations of Paragraph 46 of the Complaint. Therefore any and all remaining allegations or facts not specifically admitted are denied.

47.     FNB has maintained the integrity of the Mark(s), with or without communications from FNI. FNI is left to its proof of the allegations of Paragraph 47 of the Complaint. Therefore any and all remaining allegations or facts not specifically admitted are denied.

48.     FNI was required, pursuant to paragraph 11 of the 1993 License Agreement, to notify FNB of any infringement and not to take action without FNB's consent.  FNI may have "policed" the Mark with and without FNB's prior consent in contradiction to said license agreement. FNI is left to its proof of the allegations of Paragraph 48 of the Complaint. Therefore any and all remaining allegations or facts not specifically admitted are denied.

49.     Any attempt of FNI to obtain trademark registration of the Mark outside the United States was done without the proper consent of FNB. The European trademark registration for the Mark has lapsed. FNI is left to its proof of the allegations of Paragraph 49 of the Complaint. Therefore any and all remaining allegations or facts not specifically admitted are denied.

**TERMINATION OF THE LICENSE AGREEMENT**

50.     FNB admits that sometime, on or about early July 2008, FNB notified FNI that it was terminating FNI's right to grant sub-licenses to the Mark, and that FNB was now managing the Mark directly. FNI is left to its proof of the allegations of Paragraph 50 of the Complaint. Therefore any and all remaining allegations or facts not specifically admitted are denied.

51.     On or about early July 2008, Geri Guardino communicated by email with the then chairperson of FNI, confirming that FNB was terminating all rights it had granted to FNI. FNI is left to its proof of the allegations of Paragraph 51 of the Complaint. Therefore any and all remaining allegations or facts not specifically admitted are denied.

52.     FNB believes the FNI chairperson requested the opportunity to discuss the termination with its board of directors. However FNB was under no obligation to provide any prior notice of the termination to FNI. FNI is left to its proof of the allegations of Paragraph 52 of the Complaint. Therefore any and all remaining allegations or facts not specifically admitted are denied.

53.     Any email from Guardino to FNI, as referenced in paragraph 53 of the Complaint, speaks for itself. FNB has always owned and maintained the Mark(s). FNI is left to its proof of the allegations of Paragraph 53 of the Complaint. Therefore any and all remaining allegations or facts not specifically admitted are denied.

54.     Once FNB terminated the rights granted to  FNI, all relationships with the sub-licensees endured to FNB and it had complete rights to immediately take control of these relationships. FNI is left to its proof of the allegations of Paragraph 54 of the Complaint. Therefore any and all remaining allegations or facts not specifically admitted are denied.

55.     Any communication or response from FNI upon learning of FNB's termination is immaterial. FNB had the unilateral ability to terminate any rights it had granted to FNI and to assume immediate control of the sub-licensees. FNI is left to its proof of the allegations of Paragraph 55 of the Complaint. Therefore any and all remaining allegations or facts not specifically admitted are denied.

56.     FNB admits that the letter identified as Exhibit F to the complaint appears to have

been received by FNB from FNI in response to FNB's decision to terminate the rights it had

granted to FNI. The letter speaks for itself. FNI is left to its proof of the allegations of Paragraph

56 of the Complaint. Therefore any and all remaining allegations or facts not specifically

admitted are denied.

57.     FNB admits that the letter identified as Exhibit G to the complaint appears to have

been received by FNB from FNI on or about late July 2008. As for the letter, its content speaks

for itself. FNI is left to its proof of the allegations of Paragraph 57 of the Complaint. Therefore

any and all remaining allegations or facts not specifically admitted are denied.

58.     FNB has at all times and continues to be the exclusive owner of the Mark(s). Any

rights FNI had to the Mark was with the consent and at the pleasure of FNB.  Upon termination

of any license from FNB, all rights granted to FNI immediately reverted automatically to FNB.

FNB admits that the letter identified as Exhibit H to the complaint appears to have been sent by

FNB to FNI. FNI is left to its proof of the allegations of Paragraph 58 of the Complaint.

Therefore any and all remaining allegations or facts not specifically admitted are denied.

59.     Once the rights of FNI were terminated by FNB, any continued action by FNI

related to sublicensing of the Mark would be in conflict with FNB's exclusive rights. To the

extent Exhibit H addresses damage to FNB that could be caused by FNI's continued involvement

with sublicensing, the letter speaks for itself. FNI is left to its proof of the allegations of

Paragraph 59 of the Complaint. Therefore any and all remaining allegations or facts not

specifically admitted are denied.

60.     If  FNI would not refrain from involvement with the sublicensing of the

Mark after FNB terminated its rights, FNB could take the necessary legal steps to protect its

interests. To the extent Exhibit H addresses the legal remedies that FNB could seek, the letter

speaks for itself. FNI is left to its proof of the allegations of Paragraph 60 of the Complaint. Therefore any and all remaining allegations or facts not specifically admitted are denied.

61.     FNB acted in full compliance with its rights under the 1993 License Agreement and the subsequent time period after said licensed lapsed, including but not limited to termination of FNI's license at will and the immediate substitution for FNI in relation to all sub-licenses.

62.     FNB is without knowledge as to FNI's "desires". FNB had full right to immediate control over all affairs related to the Mark upon termination of FNI's license. FNI is left to its proof of the allegations of Paragraph 62 of the Complaint. Therefore any and all remaining allegations or facts not specifically admitted are denied.

63.     FNB admits that FNI did send correspondence on or about August 26, 2008. FNB had full right to immediate control over all affairs related to the Mark upon termination of FNI's license. FNB was under no obligation to accept or respond to FNI's offer or recommendations. FNI is left to its proof of the allegations of Paragraph 63 of the Complaint. Therefore any and all remaining allegations or facts not specifically admitted are denied.

64.     FNB had full right to communicate immediately, after terminating FNI's license, with the sub-licensees as the licensor. FNB had no obligation to follow FNI's request it refrain from communicating with the sub-licensees. FNB had full right to immediate control over all affairs related to the Mark upon termination of FNI's license. FNI is left to its proof of the allegations of Paragraph 64 of the Complaint. Therefore any and all remaining allegations or facts not specifically admitted are denied.

65.     FNB had full right to immediate control over all affairs related to the Mark upon termination of FNI's license including but limited to the collection of membership dues. Upon

termination of its license, FNI no longer had any right to collect membership dues from First Night licensees. As for the content of the September 5th communication, Exhibit J speaks for itself. FNI is left to its proof of the allegations of Paragraph 65 of the Complaint. Therefore any and all remaining allegations or facts not specifically admitted are denied.

66.     FNB had full right to communicate immediately, after terminating FNI's license, with the sub-licensees as the owner and licensor of the MARK. FNB had no obligation to refrain from communicating with the sub-licensees. FNB provided accurate and honest information in its communications with its licensee. FNB had full right to immediate control over all affairs related to the Mark upon termination of FNI's license. As for the content of the January 26th letter, Exhibit K speaks for itself. FNI is left to its proof of the allegations of Paragraph 66 of the Complaint. Therefore any and all remaining allegations or facts not specifically admitted are denied.

67. The "New York" complaint filed by FNI against FNB was dismissed by the Court. To the extent FNB communicated this information to anyone, it was accurate and truthful information. Any and all remaining allegations or facts of this paragraph not specifically admitted are denied.

68.     FNB had full right to immediate control over all affairs related to the Mark upon termination of FNI's license. All sub-licensees immediately became licensees of FNB upon the termination of FNI's agreement. FNI is left to its proof of the allegations of Paragraph 68 of the Complaint. Therefore any and all remaining allegations or facts not specifically admitted are denied.

69.     FNB is without knowledge of any "confusion". FNB had full right to immediate control over all affairs related to the Mark upon termination of FNI's license. FNI is left to its

proof of the allegations of Paragraph 69 of the Complaint. Therefore any and all remaining allegations or facts not specifically admitted are denied.

70.     FNB is not aware of specific lost membership and non-renewals which are the direct result of its termination of FNI's license. Rather, for the past number of years membership has continuously declined under FNI's poor management of the brand. FNI is left to its proof of the allegations of Paragraph 70 of the Complaint. Therefore any and all remaining allegations or facts not specifically admitted are denied.

71.     FNI has no rights with respect to the Mark after FNB terminated the license. The allegation is moot.  FNI is left to its proof of the allegations of Paragraph 71 of the Complaint. Therefore any and all remaining allegations or facts not specifically admitted are denied.

72.     FNI has no rights with respect to the Mark after FNB terminated the license. The allegation is moot.  FNI is left to its proof of the allegations of Paragraph 72 of the Complaint. Therefore any and all remaining allegations or facts not specifically admitted are denied.

73.     FNI has no rights with respect to the Mark after FNB terminated the license. The allegation is moot.  FNI is left to its proof of the allegations of Paragraph 73  of the Complaint. Therefore any and all remaining allegations or facts not specifically admitted are denied.

74.     FNB has allowed FNI to sub-license the Mark for the past number of years on at will basis. FNB had full right to terminate the relationship at its sole discretion, which it did on or about July 2008. Once the license was terminated, FNI no longer had any rights in relation to the Mark, including providing any further sub-licenses or services in support of existing sub-licenses unless it was with the consent of FNB. FNB did not give its consent to FNI. FNI is left to its proof of the allegations of Paragraph 74 of the Complaint. Therefore any and all remaining allegations or facts not specifically admitted are denied.

16

75.     The 1993 License Agreement automatically terminated in 2003 when FNI failed to comply with its terms. FNB informed FNI it would not assign or transfer the MARK. Since no later than 2003, FNI had only a month to month license arrangement with FNB. The language cited from Exhibit A is therefore moot. FNI is left to its proof of the allegations of Paragraph 75 of the Complaint. Therefore any and all remaining allegations or facts not specifically admitted are denied.

76.     FNI failed to perform in accordance with the terms of the 1993 License Agreement which lapsed in 2003. The 1993 License Agreement called for an automatic five year extension until 2003. The 1993 License Agreement ended in 2003 based on the "automatic" termination provision. FNI is left to its proof of the allegations of Paragraph 76 of the Complaint. Therefore any and all remaining allegations or facts not specifically admitted are denied.

77.     FNB is without specific knowledge of FNI's current status. FNI is left to its proof of the allegations of Paragraph 77 of the Complaint. Therefore any and all remaining allegations or facts not specifically admitted are denied.

78.     FNB is without specific knowledge of FNI's present acts. However, not withstanding, FNI no longer has any rights in relation to the Mark. Once FNB terminated its license with FNI in July 2008, all such rights terminated. FNI is left to its proof of the allegations of Paragraph 78 of the Complaint. Therefore any and all remaining allegations or facts not specifically admitted are denied.

79.     There is no longer a license agreement. The allegation is moot. FNI is left to its proof of the allegations of Paragraph 79 of the Complaint. Therefore any and all remaining allegations or facts not specifically admitted are denied.

80.     FNB is without specific knowledge of FNI's present balance sheet. However, not

withstanding, FNI no longer has any rights in relation to the Mark. Once FNB terminated its

relationship with FNI in July 2008, all such rights terminated. FNI is left to its proof of the

allegations of Paragraph 80 of the Complaint. Therefore any and all remaining allegations or

facts not specifically admitted are denied.

## OWNERSHIP OF THE "FIRST NIGHT" MARK

81.      FNB has at all times and remains today the owner of the Mark. FNB denies that it

failed to assign the Mark. First, FNI did not satisfy the requirements of the 1993 License

Agreement. More importantly, even if FNI had satisfied said provision, the agreement or at least

the provision calling for an assignment of the MARK is void as a matter of law. The 1993

License Agreement is void because certain FNB board members who ratified the agreement were

not disinterested parties and had an inherent conflict of interest. The transfer of such asset by

FNB to FNI related to a substantial asset of FNB, and as a non-profit the agreement was subject

to particular statutory approvals, none of which were received. Therefore, to the extent such

provision existed, it was and is void. FNI is left to its proof of the allegations of Paragraph 81 of

the Complaint. Therefore any and all remaining allegations or facts not specifically admitted are

denied.

82. Ownership of a Federal Registered Trademark can be evidenced by use in interstate

commerce by the owner or a licensee. The allegation calls for a legal conclusion. Therefore any

and all remaining allegations or facts not specifically admitted are denied.

83.      FNI has used the Mark in interstate commerce under license from FNB. For

purposes of trademark validity, any FNI use subject to a license agreement or other authorization

from FNB satisfies the statutory requirements of continuous use by FNB during the years when

the Mark has been a Federal registered trademark. Any and all remaining allegations or facts not

18

specifically admitted are denied.

84.     FNB has established use of the Mark in interstate commerce through FNI's "allowed" use. For purposes of trademark validity, FNI use subject to a license agreement or other authorization satisfies the statutory requirements of continuous use by FNB during the years when the Mark has been a Federal registered trademark. Any and all remaining allegations or facts not specifically admitted are denied.

85.     FNI had a license to use the Mark subject to certain terms and conditions contained in the 1993 License Agreement with FNB. FNB retained rights to use the Mark under such license agreement. FNI was permitted by FNB to grant sublicenses. FNB terminated any such rights in 2008. Upon termination of the FNI license, all sublicenses became licensees of FNB automatically.  Any and all remaining allegations or facts not specifically admitted are denied.

86.     Under the 1993 License Agreement, except for FNB's retained rights, FNI had exclusive right to grant sublicenses to the Mark.  The 1993 License Agreement speaks for itself. Therefore any and all remaining allegations or facts not specifically admitted are denied.

87.     FNB believes that FNI, at times, has made efforts to identify unauthorized uses of the Mark. Further, FNI may have taken some steps, with and without FNB's knowledge, to curtail unauthorized uses of the Mark. However, the limit of FNI's authority and responsibility under the 1993 License Agreement, absent any additional written authority given by FNB, was to notify FNB of alleged infringing uses. FNI may have exceeded its authority without the consent of FNB and may have taken independent "cease and desist" actions against potential infringers. Any and all remaining allegations or facts not specifically admitted are denied.

88.     FNB may have inadvertently authorized use of the Mark on glasses one time in

the past, but when reminded by FNI, FNB rescinded the authorization. Any and all remaining allegations or facts not specifically admitted are denied.

89.     FNB may have inadvertently authorized use of the Mark on glasses one time in the past, but when reminded by FNI, FNB rescinded the authorization. Any and all remaining allegations or facts not specifically admitted are denied.

90.     Under the 1993 License Agreement, FNI was required to notify FNB of any alleged infringing uses of the Mark that it became aware of. At least through FNI's efforts, FNB monitored unauthorized uses of the Mark. FNB may have inadvertently authorized use of the Mark on glasses one time in the past, but when reminded by FNI, FNB rescinded the authorization. Any and all remaining allegations or facts not specifically admitted are denied.

91.     FNI has not compiled with all terms of the 1993 License Agreement. In particular, it has not notified FNB of alleged infringing uses of the Mark when they were discovered. Additionally, FNI failed to meet the "financial stability" test as specified in paragraph 1(B) and 1(C) of said license agreement, and the 1993 License Agreement automatically terminated. Any and all remaining allegations or facts not specifically admitted are denied.

92.     The 1993 License Agreement, particularly those sections addressing any transfer of FNB assets, is void because it was improperly authorized and not in compliance with statutory provisions governing not-for-profit corporations. Even if the license agreement provision for transferring assets was valid, FNI never demonstrated the necessary requirements to satisfy the provision, so the allegation is moot. Any and all remaining allegations or facts not specifically admitted are denied.

93. From the execution of the 1993 License Agreement until 2008, FNI functioned only as a licensee of FNB. FNB has at all times been the owner of the Mark. Any and all remaining

allegations or facts not specifically admitted are denied.

## COUNT I

## FEDERAL TRADEMARK INFRINGEMENT 15 U.S.C. §1114

94.    FNB repeats and fully incorporates the answers in paragraphs 1 through 93 as set forth hereunder.

95.    FNB is the owner of the Mark. It terminated any right of use by FNI in 2008. FNB's use of the Mark at all times has been consistent with the rights it retained in the 1993 License Agreement, and its continuing right as owner of the Mark. Any and all remaining allegations or facts not specifically admitted are denied.

96.    FNI never had any rights with regard to FNB's use of the Mark. The plaintiff is left to their proof of the allegations of this paragraph 96 of the complaint. Any and all remaining allegations or facts not specifically admitted are denied.

97.    FNI has and never has had any intellectual property rights in the Mark. Therefore the allegation is moot. The plaintiff is left to their proof of the allegations of this paragraph 97 of the complaint. Any and all remaining allegations or facts not specifically admitted are denied.

98.    There has been no unlawful activity by FNB, and henceforth no irreparable harm as a result suffered by FNI. The plaintiff is left to their proof of the allegations of this paragraph 98 of the complaint. Any and all remaining allegations or facts not specifically admitted are denied.

99. There has been no unlawful activity by FNB, and henceforth no damage as a result suffered by FNI. The plaintiff is left to their proof of the allegations of this paragraph 99 of the complaint. Any and all remaining allegations or facts not specifically admitted are denied.

## COUNT II

### FEDERAL UNFAIR COMPETITION 15U.S.C. §1125(a)

100.    FNB repeats and fully incorporates the answers in paragraphs 1 through 99 as set forth hereunder.

101.    The authority and source of origin concerning the Mark resides exclusively with FNB. FNI no longer has any rights in relation to the Mark. The plaintiff is left to their proof of the allegations of this paragraph 101 of the complaint. Any and all remaining allegations or facts not specifically admitted are denied.

102.    FNB has not misled or deceived anyone. FNB has simply exercised its rights of ownership of the Mark. The plaintiff is left to their proof of the allegations of this paragraph 102 of the complaint. Any and all remaining allegations or facts not specifically admitted are denied.

103.    FNI no longer enjoys any rights in relation to the Mark. Therefore FNB's actions could not cause any harm to FNI. The plaintiff is left to their proof of the allegations of this paragraph 103 of the complaint. Any and all remaining allegations or facts not specifically admitted are denied.

104. FNI no longer enjoys any rights in relation to the Mark. By contract, all rights accrued by FNI during the term of the 1993 License Agreement, immediately were assumed by FNB at the time it lapsed. Therefore FNB's actions could not be a misappropriation of the goodwill or reputation of the Mark or FNI. The plaintiff is left to their proof of the allegations of this paragraph 104 of the complaint. Any and all remaining allegations or facts not specifically admitted are denied.

105.    FNB is not acting in unfair competition with FNI. FNI's right under the 1993 License Agreement and the follow on license agreement were properly terminated by FNB. The

22

plaintiff is left to their proof of the allegations of this paragraph 105 of the complaint. Any and all remaining allegations or facts not specifically admitted are denied.

106.    FNI's license was terminated  and  any rights there under were extinguished. There has been no unfair competition by FNB, and henceforth no damage as a result suffered by FNI. The plaintiff is left to their proof of the allegations of this paragraph 106 of the complaint. Any and all remaining allegations or facts not specifically admitted are denied.

## COUNT III

## BREACH OF CONTRACT

107.    FNB repeats and fully incorporates the answers in paragraphs 1 through 106 as set forth hereunder.

108.    In 1993 FNB entered into a license agreement with FNI.

109.    From 1993 until 2003, FNI was granted certain rights to the Mark under the 1993 License Agreement with FNB. Subsequent, FNB granted permission to FNI to sublicense the Mark, such permission which could be revoked at will by FNB. Regardless, the 1993 License Agreement automatically terminated in 2003 when FNI failed to comply with certain provisions known as "financial stability". Therefore the allegation is moot. The plaintiff is left to their proof of the allegations of this paragraph 109 of the complaint. Any and all remaining allegations or facts not specifically admitted are denied.

110.    FNI did not comply with the terms of the 1993 License Agreement. The plaintiff is left to their proof of the allegations of this paragraph 110 of the complaint. Any and all remaining allegations or facts not specifically admitted are denied.

111.    In 2003, the 1993 License Agreement automatically ended. Subsequently FNB granted temporary permission to FNI to continue sublicensing the Mark, and FNB held at all

times the right to terminate said permission at will. The plaintiff is left to their proof of the allegations of this paragraph 111 of the complaint. Any and all remaining allegations or facts not specifically admitted are denied.

112. FNB is without specific knowledge as to whether the allegation refers to the 1993 License Agreement or the period of time after it ended when FNB granted FNI permission to continue sublicensing of the Mark. Regardless, FNB denies breaching the license agreement. The plaintiff is left to their proof of the allegations of this paragraph 112 of the complaint. Any and all remaining allegations or facts not specifically admitted are denied.

113. FNI failed to comply with the terms of the 1993 License Agreement. FNB rightfully terminated any license or permission it had granted to FNI because FNI did achieve "financial stability" and FNI's continued involvement with the Mark was not in the best interest of FNB. FNB's termination of its relationship with FNI was not deliberate, malicious or willful. The plaintiff is left to their proof of the allegations of this paragraph 113 of the complaint. Any and all remaining allegations or facts not specifically admitted are denied.

114. FNB's action in terminating FNI's right to sublicense the Mark was not wrongful. Any damage suffered by FNI is the direct result of its own actions, mis-management and inadequate financial stability. An injunction against FNB is not warranted and not proper. The plaintiff is left to their proof of the allegations of this paragraph 114 of the complaint. Any and all remaining allegations or facts not specifically admitted are denied.


**COUNT IV**

**TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS**

115. FNB repeats and fully incorporates the answers in paragraphs 1 through 106 as set

forth hereunder.

116.    To the extent this allegation is directed to the 1993 License Agreement between FNB and FNI, the license agreement speaks for itself. FNI was granted certain rights to sublicense the Mark by FNB, during the term of the 1993 License Agreement and for a period of time subsequent to its termination. The plaintiff is left to their proof of the allegations of this paragraph 116 of the complaint. Any and all remaining allegations or facts not specifically admitted are denied.

117.    To the extent this allegation is directed to the 1993 License Agreement between FNB and FNI, the license agreement speaks for itself. FNI was granted certain rights to sublicense the Mark by FNB, during the term of the 1993 License Agreement and for a period of time subsequent to its termination.  Likewise FNB retained certain rights to the Mark, including but not limited to First Night celebration for Boston.  The plaintiff is left to their proof of the allegations of this paragraph 117 of the complaint. Any and all remaining allegations or facts not specifically admitted are denied.

118. To the extent this allegation is directed to the 1993 License Agreement between FNB and FNI, the license agreement speaks for itself. FNI was granted certain rights to sublicense the Mark by FNB, during the term of the 1993 License Agreement and for a period of time subsequent to its termination.  Likewise FNB retained certain rights to the Mark, including but not limited to First Night celebration for Boston.  The plaintiff is left to their proof of the allegations of this paragraph 118 of the complaint. Any and all remaining allegations or facts not specifically admitted are denied.

119. FNB at all times has remained the rightful owner of the Mark. Whenever FNI acted under the 1993 License Agreement it did so with the permission of FNB and on behalf of FNB in

protecting the Mark. The plaintiff is left to their proof of the allegations of this paragraph 119 of the complaint. Any and all remaining allegations or facts not specifically admitted are denied.

120. In 2003, the 1993 License Agreement between FNB and FNI lapsed. Eventually all rights granted to FNI were terminated.  There was no longer a valid license to the MARK after the termination. Therefore the allegation is moot. The plaintiff is left to their proof of the allegations of this paragraph 120 of the complaint. Any and all remaining allegations or facts not specifically admitted are denied.

121. Any actions taken by FNB in 2009 were proper and within its right as owner of the Mark. In view of the fact that no license to the Mark existed, FNB's actions were proper. The plaintiff is left to their proof of the allegations of this paragraph 121 of the complaint. Any and all remaining allegations or facts not specifically admitted are denied.

122. In 2008 after FNB gave notice to FNI that it was terminating FNI's authority to sublicense the Mark, there was no longer any agreement between FNB and FNI. Therefore the allegation is moot.  The plaintiff is left to their proof of the allegations of this paragraph 122 of the complaint. Any and all remaining allegations or facts not specifically admitted are denied.

123. Whatever action taken by FNB in 2009 with regard to the Mark, was in what it deemed to be the best interest of preserving and protecting the Mark. In 2008 after FNB gave notice to FNI that it was terminating FNI's authority to sublicense the Mark, there was no contractual agreement between FNB and FNI. Therefore the allegation is moot.  The plaintiff is left to their proof of the allegations of this paragraph 123 of the complaint. Any and all remaining allegations or facts not specifically admitted are denied.

124.     An injunction against FNB is not warranted and not proper. FNB's action was not wrongful. Any damage to FNI's reputation, goodwill or otherwise was directly the result of its

26

own accord, including but not limited to financial instability, poor management, continuously declining membership, and inadequate staffing. Therefore the allegation is moot.  The plaintiff is left to their proof of the allegations of this paragraph 124 of the complaint. Any and all remaining allegations or facts not specifically admitted are denied.

## COUNT V

## TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS

125.    FNB repeats and fully incorporates the answers in paragraphs 1 through 124 as set forth hereunder.

126.    As it relates to the Mark, FNI no longer has any valid business relationships with Member communities concerning use of the MARK. Therefore the allegation is moot.  The plaintiff is left to their proof of the allegations of this paragraph 126 of the complaint. Any and all remaining allegations or facts not specifically admitted are denied.

127.    As it relates to the Mark, FNI no longer has any valid business relationships with Member communities concerning use of the MARK. Therefore the allegation is moot.  The plaintiff is left to their proof of the allegations of this paragraph 127 of the complaint. Any and all remaining allegations or facts not specifically admitted are denied.

128.    As it relates to the Mark, FNI no longer has any valid business relationships with Member communities. Therefore the allegation is moot.  The plaintiff is left to their proof of the allegations of this paragraph 128 of the complaint. Any and all remaining allegations or facts not specifically admitted are denied.

129.    As it relates to the Mark, FNI no longer has any valid business relationships with Member communities. Therefore the allegation is moot.  The plaintiff is left to their proof of the allegations of this paragraph 129 of the complaint. Any and all remaining allegations or facts not

specifically admitted are denied.

130.    FNB's conduct was within its rights. As it relates to the Mark, FNI no longer has any valid business relationships with Member communities. Therefore the allegation is moot.

131.    Whatever action taken by FNB in 2009 with regard to the Mark, was what it deemed to be the best interest of preserving and protecting the Mark. In 2008 after FNB gave notice to FNI that it was terminating FNI's authority to sublicense the Mark, there was no contractual agreement between FNB and FNI. Therefore the allegation is moot.  The plaintiff is left to their proof of the allegations of this paragraph 131 of the complaint. Any and all remaining allegations or facts not specifically admitted are denied.

132.    An injunction against FNB is not warranted and not proper. FNB's action was not wrongful. Any damage to FNI's reputation, goodwill or otherwise was directly the result of its own accord, including but not limited to financial instability, poor management, continuously declining membership, and inadequate staffing. Therefore the allegation is moot.  The plaintiff is left to their proof of the allegations of this paragraph 132 of the complaint. Any and all remaining allegations or facts not specifically admitted are denied.

## COUNT VI

## COMMON LAW UNFAIR COMPETITION

133.    FNB repeats and fully incorporates the answers in paragraphs 1 through 132 as set forth hereunder.

134.    FNB denies that it has committed any acts of unfair competition.

135.    FNB is and has been the rightful owner of the Mark. Whatever action taken by FNB in 2009 with regard to the Mark, was in what it deemed to be the best interest of preserving and protecting the Mark.  FNB's conduct was within its rights. In 2008 after FNB gave notice to

28

FNI that it was terminating FNI's authority to sublicense the Mark, as it relates to the Mark, FNI no longer has any valid business relationships with Member communities. Therefore the allegation is moot.  The plaintiff is left to their proof of the allegations of this paragraph 135 of the complaint. Any and all remaining allegations or facts not specifically admitted are denied.

136.    Any and all rights of FNI as they relate to the Mark were extinguished when FNB terminated FNI's rights to the Mark in 2008. Therefore the allegation is moot.  The plaintiff is left to their proof of the allegations of this paragraph 136 of the complaint. Any and all remaining allegations or facts not specifically admitted are denied.

137.    Any and all rights of FNI as they relate to the Mark were extinguished when FNB terminated FNI's rights to the Mark in 2008. Therefore the allegation is moot.  The plaintiff is left to their proof of the allegations of this paragraph 137 of the complaint. Any and all remaining allegations or facts not specifically admitted are denied.

138.    Any and all rights of FNI as they relate to the Mark were extinguished when FNB terminated FNI's rights to the Mark in 2008. Therefore the allegation is moot.  The plaintiff is left to their proof of the allegations of this paragraph 138 of the complaint. Any and all remaining allegations or facts not specifically admitted are denied.

139.    FNB denies that it has committed any acts of unfair competition. FNB is and has been the rightful owner of the Mark. Whatever action taken by FNB in 2009 with regard to the Mark, was in what it deemed to be the best interest of preserving and protecting the Mark. FNB's conduct was within its rights. In 2008 after FNB gave notice to FNI that it was terminating FNI's authority to sublicense the Mark, FNI no longer had any valid business activities in conjunction with the Mark. Therefore the allegation is moot.  Any and all remaining allegations or facts not specifically admitted are denied. An injunction as requested by FNI is not

29

justified and the Court should deny FNI's request.

140.    Any benefit received by FNB was within its right as the exclusive owner of the Mark. Whatever action taken by FNB in 2009 with regard to the Mark, was in what it deemed to be the best interest of preserving and protecting the Mark.  FNB's conduct was within its rights. In 2008 after FNB gave notice to FNI that it was terminating FNI's authority to sublicense the Mark, FNI no longer had any valid business activities in conjunction with the Mark. Therefore the allegation is moot. The plaintiff if left to their proof of the allegations of paragraph 140 of the complaint. At trial FNI will be unable to establish any damage as direct result of FNB's actions. Any and all remaining allegations or facts not specifically admitted are denied.

///

## AFFIRMATIVE DEFENSES

## FIRST AFFIRMATIVE DEFENSE

### (Failure to State A Claim Upon Which Relief Can Be Granted)

1.      Defendants have not breached any obligations or duties owed to the plaintiff.

2.      Plaintiff's have alleged, and therefore admit knowledge of, a provision of the 1993 License Agreement under which they could receive transfer of ownership of the Mark.

3.      Plaintiff's have alleged that in 1998 they had satisfied the requirements of the 1993 License Agreement, but Defendant breached the agreement by failing to transfer ownership of the Mark.

4.      Since such alleged contract breach occurred eleven years ago, Plaintiff is barred by the statute of limitations from raising any claims for said alleged breach.

5.      Plaintiff fails to state a claim upon which relief may granted in whole or in part.

## SECOND AFFIRMATIVE DEFENSE

### (Estoppel)

1.      Plaintiff failed to comply with the terms of the 1993 License Agreement.

2.      Plaintiff, for over six years after said agreement ended, has never alleged any contract breach by the  defendant

3.      Plaintiff is now barred from seeking relief on the basis of the agreement under the doctrine of estoppel.

## THIRD AFFIRMATIVE DEFENSE

### (Unclean Hands)

1.      While the plaintiff had the right to sub-license the Mark over the last several years,  the number of sub-licensees has been continuously declining

2.      Plaintiff has not maintained adequate full time staff to support sub-licensees or maintain the membership base.

3.      Plaintiff's mismanagement has caused damage to the Mark and whatever damage to its own organization through its own acts or lack thereof.

4.      Plaintiff is now barred from seeking the requested relief under the doctrine of unclean hands.

## FOURTH AFFIRMATIVE DEFENSE

### (Defendants Acted in Good Faith)

1.      Defendants continued to allow plaintiff the right to sub-license the Mark until it became apparent the plaintiff's mismanagement was damaging the Mark.

2.      Defendants have acted at all times in good faith in an attempt to protect the value and integrity of the Mark.

## FIFTH AFFIRMATIVE DEFENSE

### (Contract is Void for Conflict of Interest)

1.      At the time in 1993 when FNB entered into the License Agreement with FNI, certain members of FNB's board of directors held interests or positions with FNI.

2.      The actions of such FNB board members were self-dealing.

3.      Said FNB board members should have recused themselves from deciding on whether to award the license to FNI.

4.      Certain or all provisions of the 1993 License Agreement between FNB and FNI is therefore void.

## SIXTH AFFIRMATIVE DEFENSE

### (Contract Provisions Transferring Assets Void By Statute)

1.      At the time FNB entered into the 1993 License Agreement with FNI, FNB was a non-profit organization operating under Massachusetts Law.

2.      The Mark represented substantial assets of FNB.

3.      The provision of the 1993 License Agreement which provided for the transfer of the asset(s) of FNB did not comply with Massachusetts law.

4.      Any provision of the license agreement calling for the transfer of the Mark is void as a matter of law.

## SEVENTH AFFIRMATIVE DEFENSE

### (Breach of Contract – Lack of Performance)

1.      During the period when FNI held a license or was granted rights to the Mark from FNB, FNI failed to maintain and provide adequate full-time support services.

2.      During the period when FNI held a license or was granted rights to the Mark from FNB, FNI failed to hire and have adequate full time staff to support the sub-licensees.

3.      During the period when FNI held a license or was granted rights to the Mark from FNB,

33

FNI failed to maintain and make available to FNB complete and accurate membership data.

4.      During the period when FNI held a license or was granted rights to the Mark from FNB, FNI failed to grow and maintain the sub-licensee base. Instead, particularly in the latter years of the FNI/FNB relationship, membership began a steady decline.

5.      FNI's aforementioned conduct and actions were damaging to the Mark and in breach of the license agreement or rights granted to it by FNB.

6.      FNB had the right to terminate the relationship to protect the integrity and value of its Mark.

///

## COUNTERCLAIMS

## FIRST COUNTERCLAIM
### (Federal Trademark Infringement)

1.   Plaintiff is the owner of United States Trademark Registration No. 1370110, registered November 12, 1985, for "FIRST NIGHT" in connection with an annual arts festival for Class 016 in association with posters and commemorative programs and for Class 041 in association with entertainment services.

2.   Plaintiff is the owner of United States Trademark Registration No. 1955526, registered February 13, 1996, for "FIRST NIGHT" in connection with an annual arts festival or related activities for Class 021 in association with mugs and for Class 025 in association with T-shirts, sweatshirts, jackets, headbands, hats.

3.   United States Trademark Registration Nos. 1370110 and 1955526 (collectively hereafter "FNB Marks") are valid, subsisting, un-cancelled and unrevoked.

4.   Continuously since on or about 1976, Counterclaimant has used the FNB Marks in connection with and to identify events and its organization and to distinguish said events from events offered by other organizations, by, and without limitation, prominently displaying said mark on websites, advertising and promotional materials distributed throughout the United States by licensed member organizations. Counterclaimant's activities and the activities of its sub-licensees under the FNB Marks and brand name are provided nationwide including in the State of Massachusetts.

5.   In addition, as of the date of the filing of this counterclaim, Counterclaimant has and is engaged in expanding its use of the FNB Mark in interstate commerce. The FNB Marks are associated with and used in connection with events held throughout the

United States by FNB's sub-licensees.

6.   Plaintiff has willfully infringed FNB Marks in interstate commerce by various acts, including, without limitation, continuing to sell, offer for sale, promote and/or advertise sub-licenses to the FNB Marks after receiving notice from FNB that its right to do so had been terminated.

7.   Plaintiff's continued use of FNB Marks are in connection with similar goods and services as offered by the Counterclaimant. Plaintiff's continued use is without permission or authority of the Counterclaimant and said use is likely to cause confusion, to cause mistake and/or to deceive.

8.   Plaintiff's use of the FNB Marks in connection with such activities have been made notwithstanding Counterclaimant's well-known and prior established rights in the trademarks  and with both actual and constructive notice of Counterclaimant's federal registration rights under 15 U.S.C. § 1072.

9.   Upon information and belief, Plaintiff's infringing activities have caused and, unless enjoined by this Court, will continue to cause, irreparable injury and other damage to Counterclaimant's organization, reputation and good will in its federally registered trademarks. Counterclaimant has no adequate remedy at law.


## COUNT TWO
### (False Designation Of Origin Under 15 U.S.C. § 1125(A))

10.    Counterclaimant hereby realleges and incorporates by reference the allegations of paragraphs 1-9 of the Counterclaims to this Complaint as if fully set forth

36

herein.

11.   Upon information and belief, Plaintiff has authorized the use of the designation "FIRST NIGHT" in connection with events held throughout the United States and thus in interstate commerce. Said use of the designation "FIRST NIGHT" is a false designation of origin, a false or misleading representation of the right to sub-license such use which is likely to cause confusion and to cause mistake, and to deceive as to the affiliation, connection or association of Counterclaimant with Plaintiff and as to the origin, sponsorship, or approval of Counterclaimant of products and commercial activities by Plaintiff.

12.   Upon information and belief, Plaintiff's wrongful activities have caused, and unless enjoined by this Court will continue to cause, irreparable injury and other damage to Counterclaimant's organization, reputation and good will in its "FIRST NIGHT" mark. Counterclaimant has no adequate remedy at law.

## COUNT THREE
### (Common Law Unfair Competition And Trademark Infringement)

13.   Counterclaimant re-alleges and incorporates by reference the allegations of paragraphs 1 through 12 of the Counterclaims to this Complaint as if fully set forth herein.

14.   Plaintiff's activities as stated herein constitute unfair competition and an infringement of Counterclaimant's common law trademark rights in the name "FIRST NIGHT" throughout the United States and in violation of Massachusetts law.

15.     Upon information and belief, Plaintiff's wrongful and infringing activities have caused, and unless enjoined by this Court will continue to cause, irreparable injury and other damage to Counterclaimant's organization, reputation and good will in its "FIRST NIGHT" mark. Counterclaimant has no adequate remedy at law.

## COUNT FOUR
### (Massachusetts Unfair Trade Practices Act)

16.     Counterclaimant re-alleges and incorporates by reference the allegations of paragraphs 1 through 15 of the Counterclaims to this Complaint as if fully set forth herein.

17.     Plaintiff knows that it has no right of claim to the FNB Marks, yet it continues to attempt to collect fees from sub-licensees and hold itself out as the owner of the FNB Marks.

18.     Plaintiff has brought this action to harass and intimidate the Counterclaimant into an economic settlement. Plaintiff is utilizing this action to force Counterclaimant into paying monies in the avoidance of legal expenses.

19.     Plaintiff's activities alleged herein constitute unfair and deceptive acts and practices in the conduct of its trade and business in violation of the General Laws of Massachusetts Chapter 93A §11.

20.     Upon information and belief, Plaintiff's wrongful and deceptive activities have caused, and unless enjoined by this Court will continue to cause, irreparable injury and other damage to Counterclaimant's organization, reputation and good will in its "FIRST NIGHT" mark. Counterclaimant has no adequate remedy at law.

WHEREFORE, Counterclaimant prays:

1.     That a preliminary and permanent injunction issue restraining Plaintiff, its

agents, servants, employees, successors and assigns and all others in concert and privity

with them from using the name "FIRST NIGHT" in connection with the offering of sub-

licenses to the FNB Marks, from infringement of United States Trademark Registration

Nos. 1370110 and 1955526, from unfairly competing with Counterclaimant, from

engaging in unfair and deceptive trade practices and from injuring Counterclaimant's

organization, reputation and diluting its trademark rights, pursuant to Section 34 of the

Lanham Act (15 U.S.C. § 1116), and the equitable power of this Court to enforce the

common law of the Commonwealth of Massachusetts.

2.     That Plaintiff be required to account to Counterclaimant for its revenues and

the actual damages suffered by Counterclaimant as a result of Plaintiff's acts or

infringement, false designation of origin, unfair competition, and unfair and deceptive

trade practices, together with interest, and that Counterclaimant's recovery be trebled,

pursuant to Section 35 of the Lanham Act (15 U.S.C. § 1117).

3.     That Plaintiff be ordered to surrender for destruction all nameplates, labels,

advertisements, and other materials incorporating or reproducing the infringing "FIRST

NIGHT" trademark, pursuant to Section 36 of the Lanham Act (15 U.S.C. § 1118), and

the equitable power of this Court to enforce the common law of the Commonwealth of

Massachusetts.

4.     That Plaintiff be compelled to pay Counterclaimant's attorneys' fees,

together with costs of this suit, pursuant to Section 35 of the Lanham Act (15 U.S.C. §

1117) and General Laws of Massachusetts Chapter 93A §11.

     5.       For such other and further relief as may be just and equitable.

          **For the Defendant/Counterclaimant,**

          **Law Offices of Mario G. Ceste LLC**

          /s mario g ceste/

Dated: September 16, 2009         _____

          Mario G. Ceste, Esq.
          Fed. Bar No. : CT24859
          Law Offices of Mario G. Ceste
          P.O. Box 82
          Wallingford, CT 06492
          Tel: 203-678-6418
          Fax: 801-761-3314
          Email: mgcpls@usa.net

## CERTIFICATE OF SERVICE

I herby certify that on September 16, 2009, a copy of the foregoing Answer to the Complaint, Affirmative Defenses and Counterclaims was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by email to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System

**THE DEFENDANT**

/s mario g ceste/

_____

Mario G. Ceste, Esq.
Fed. Bar No. : CT24859
Law Offices of Mario G. Ceste
P.O. Box 82
Wallingford, CT 06492
Tel: 203-678-6418
Fax: 801-761-3314
Email: mgcpls@usa.net